# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY MONK, individually and on behalf of all other similarly situated individuals, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:13-cv-01880-SRU |
| v. | ) ) ) | November 21, 2014 |
| ELITE LIMOUSINE SERVICE, INC., RONALD MONTROSS, DANIEL GARDELLA, and STEVEN SCHIANO, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO PROCEED AS A COLLECTIVE ACTION AND TO AUTHORIZE NOTICE TO INDIVIDUALS IN THE PUTATIVE COLLECTIVE

Defendants Elite Limousine Service, Inc. ("Elite"), Ronald Montross, Daniel Gardella, and Steven Schiano ("Defendants") oppose Plaintiff Jeffrey Monk's ("Plaintiff") Motion to Proceed as a Collective Action and to Authorize Notice to Individuals in the Putative Collective Action ("Motion"). *See* Dkt. 39-40. Plaintiff has failed to establish that he and members of any group of drivers are "similarly situated" as required under the Fair Labor Standards Act ("FLSA"). Indeed, Plaintiff has not shown that Defendants subjected any group of employees to a common policy that violated the law. Particularly under the more stringent standard for conditional certification that applies in a case like this, where discovery is nearly complete, he has failed to carry his burden by a significant margin. All of the record evidence, including Plaintiff's own testimony, proves that Elite did not subject drivers to a common unlawful policy.

Conditional certification is also inappropriate because individualized inquires will overwhelm this action and undermine any efficiencies that a collective action might pose. The

liability and damages issues in this overtime case revolve around a fact-intensive question, namely whether the activities in which each driver engaged between driving assignments were compensable work. The answer to this question is not susceptible to generalized proof and intrinsically requires a painstaking, person-by-person, and week-by-week analysis into each driver's particular circumstances. It is not even possible to determine who is included in Plaintiff's proposed class (i.e. drivers who worked more than 40 hours in one or more weeks) without undertaking such an individual analysis. These individualized inquiries are unavoidable and dwarf any common threads in this action that might otherwise create efficiencies militating in favor of collective treatment.

Other factors further compound the obstacles to collective treatment in this action. For example, the record reflects that the other drivers whom Plaintiff would like to invite to join his case have no interest in joining this action. Despite the advanced stage of this litigation, no drivers have joined this action or provided statements to support Plaintiff's contentions. Even Plaintiff's closest friends rejected his in-person recruiting efforts. Conversely, many drivers have stated an express disinterest in this action and have waived the claims that Plaintiff wishes to pursue or agreed to arbitrate all such claims on an individual, non-class basis.

The misplaced nature of Plaintiff's bid to pursue this action on a representative basis is also illustrated by the fact that Plaintiff is not even a member of the class he asks the Court to conditionally certify. He was a part-time driver who never worked overtime. Plaintiff also testified that, despite his desires to serve as a class representative, he does not know or care about other drivers' hours of work or wages paid.

At bottom, adjudication of this matter on a collective basis is not reasonably possible, and conditional certification would thwart the goals of efficiency and fairness that underlie the collective action device. The Court should therefore deny Plaintiff's Motion.

## RELEVANT FACTUAL BACKGROUND

### A.   Plaintiff's Part-Time Employment, Resignation, and Retaliatory Lawsuit

Despite filing this *overtime* lawsuit, Plaintiff was a *part-time* driver for Elite, who never worked more than 40 hours per week. *See* Schiano Dep. 20:10-22, excerpts attached as Ex. 1; *See* Marra Dec. ¶ 4, attached as Ex. 2. Elite's detailed records reveal that throughout his employment, from February 8, 2011 until his voluntary resignation on March 19, 2014, Plaintiff never worked more than 40 hours in any workweek. Marra Dec. ¶ 4.

Despite his part-time status, Plaintiff commenced this proposed collective action on behalf of Elite's full time drivers on December 19, 2013, and filed an Amended Complaint on July 22, 2014.[1] *See* Dkt. 1 and 31. At his deposition, Plaintiff's testimony laid bare his true motivations and revealed that he did not file this action because of any unfair wage payment practices that he experienced while working for Elite. *See* Monk Dep. 89:5-91:24, excerpts attached as Ex. 3. Plaintiff testified that during his 3 years of employment with Elite, he never had any complaints about the way he was paid, and he filed this lawsuit to retaliate against Elite and Mr. Schiano for being "nasty" to him when he submitted faulty vacation paperwork in December 2013. *Id.* 89:5-91:24, 161:1-3. Specifically, Plaintiff testified that "the tone in [Mr. Schiano's] voice" is the reason that he filed this lawsuit. *Id.* 89:5-91:24 ("Q. So you were upset

---

[1] Plaintiff's Amended Complaint also includes an overtime claim under Connecticut law, which Plaintiff identified as a proposed class claim under Fed. R. Civ. P. 23 ("Rule 23"). However, Plaintiff has not filed a motion for class certification under Rule 23, and the deadline for Plaintiff to file such a motion expired on August 1, 2014. *See* Dkt. 18 and 23.

with the way Mr. Schiano spoke to you?  A.  Yes.  Q.  And that's why you decided to file this lawsuit.  A. Yep.").

Plaintiff alleges that Defendants failed to pay overtime compensation to him and approximately 40-50 other drivers in violation of the FLSA (*see* 29 U.S.C. § 201, *et seq.*) and the Connecticut Minimum Wage Act ("CMWA") (*see* C.G.S. §  31-58, *et seq.*).  *See* Dkt. 31, Am. Compl. ¶ 1, 5, 10-13.  As the entire factual predicate for his overtime claim, Plaintiff asserts that he and other drivers were "required to wait and be on call during the time between driving assignments," and that Elite did not credit that time as hours of "work" for purposes of calculating each driver's entitlement to overtime compensation.[2]  *Id.* 11.  Plaintiff maintains that "[t]he time spent waiting was compensable time under the law since [he and other drivers] were not free to engage in personal activities and the waiting time was primarily for the benefit of the Defendant."  *Id.*   As a result of this alleged compensable on-call time, Plaintiff alleges that he and "all other Limousine Drivers customarily and regularly worked between 50 and 100 hours per week, but were not paid overtime compensation at a rate of one-and-one half times their regular rate of pay for all hours over 40 per week."  *Id.* ¶ 13.

**B.     Elite's Business And Payment Of Wages To Drivers**

Elite is a Connecticut company that provides transportation services to individuals throughout the state and surrounding areas, including New York and New Jersey.  *See* Am. Compl. ¶ 10.   Mr. Montross and Mr. Gardella are Elite's principals.  *See* Montross Dep. 4:19-5:5, excerpts attached as Ex. 4.   Mr. Schiano and Daniel Marra manage Elite's day-to-day operations.  *See* Montross Dep. 13:11-14:25.  To transport its clients, often to and from airports,

---

[2] Plaintiff does not ground his overtime claim on allegations that Elite required him to perform duties beyond his so-called "on-call" duties.  In fact, Plaintiff has testified that he had no duties other than driving.  *See* Monk Dep. 177:23-178:4 ("Other than driving the vehicles for Elite, did you have any other job duties?  A. No.  Q.  That's all you were asked to do?  A. That's it.").

Elite employs approximately 27 to 29 drivers or chauffeurs at any given time.  *See* Marra Dec. ¶ 3.  Of those drivers, about 22 to 25 work for Elite on a full-time basis.  *Id*.  The rest are part-time drivers, like Plaintiff.  *Id*.

Elite has no policy or practice requiring drivers to work a particular number of hours each week, and it does not require any driver to work more than 40 hours per week.  *See* Marra Dec. ¶ 5.  How many hours each driver works is a decision that rests primarily with the individual driver.  *Id*.  Plaintiff has never contested these facts.

Drivers typically contact Elite's dispatchers to report when they are available to take on assignments (or "trips").  *See* Marra Dec. ¶ 6; Monk Dep. 179:15-183:9.  Dispatchers then offer trips to drivers via email and/or text message, and drivers accept or reject trips by responding to the electronic communication.  *See* Marra Dec. ¶ 6; Monk Dep. 179:15-183:9.  Drivers verify through verbal or electronic communications with dispatch when they are on their way to pick up a customer, when they arrive at each pickup location, again when the customer enters the vehicle, and a final time after dropping the customer at his or her destination.  *See* Marra Dec. ¶ 6.

Utilizing software called Livery Coach, Elite tracks all drivers' hours of work, including the amount of time that it takes to perform each driving assignment.  *See* Schiano Dep. 24:12-20; Marra Dec. ¶ 7.  Elite compiles and maintains records regarding the specific number of hours that each driver works based on the information that the drivers themselves communicate to dispatch.  *See* Schiano Dep. 63:16-64:13; Marra Dec. ¶ 7.  The amount of time required to perform each driving assignment varies depending on a number of factors -- such as fluctuations in weather and traffic conditions.  *See* Marra Dec. ¶ 7.  A particular assignment might take 1.5 hours one day, while the same assignment might take 3 hours another day.  *See id*.  Because

drivers report to dispatch the beginning and end time of each trip, Elite captures the actual amount of time that drivers work on each assignment. *See id.* Elite does not capture the drivers' time between assignments because, as detailed below, drivers are totally relieved of duties during those times and free to engage in personal activities. *See* Marra Dec. ¶ 10-14; Monk Dep. 185:8-19, 195:2-8, 199:11-20; Schiano Dep. 49:1-50:12, 72:24-73:19.

Elite assigns each full-time driver a designated vehicle and allows the driver to take the vehicle home, if he so chooses. *See* Marra Dec. ¶ 8; Montross Dep. 30:16-18; 32:23-33:3. Elite does this as a benefit and convenience to full-time drivers, so they do not have to report to Elite's office to pickup and drop off vehicles before, after, and between assignments. *See* Marra Dec. ¶ 8; Montross Dep. 33:5-34:23.

On the other hand, part-time drivers, like Plaintiff, are not permitted to bring Elite's vehicles home with them. *See* Marra Dec. ¶ 8. The reason for this is simple. If a vehicle is parked at a driver's home, then it is not on the road transporting customers, and it is not making money for the driver or Elite. *Id.* Part-time employees do not work enough to justify keeping Elite's vehicles at their homes and rendering them unavailable to customers and other drivers. *Id.* Instead, part-time drivers like Plaintiff fill in by borrowing vehicles assigned to full-time drivers during the full-time drivers' down time. *Id.*

Elite pays drivers on a per-job basis. *See* Mara Dec. ¶ 9. Drivers receive commissions for every driving assignment, consisting of 20-25% of the base amount that Elite charges to the customer, plus a gratuity that is at the customer's discretion and averages approximately 20% of the charge for the trip. *Id*; Montross Dep. 57:7-59:22. In addition, drivers receive certain special and differential compensation, such as additional payments for "early morning" assignments. *See* Marra Dec. ¶ 9. Elite also pays drivers for time spent waiting for scheduled pickups. *Id*;

Schiano Dep. 36:20-37:1.  Elite charges clients $65 per hour, in 15 minute increments, when they are late for a scheduled pickup.  *See* Marra Dec. ¶ 9.  The driver who must wait for the scheduled pickup receives 40% of the waiting time charge (i.e., $26/hour for doing nothing but waiting).  *Id.*

### C.    Drivers' Work Hours

Plaintiff's unsupported representations regarding the number of hours that he and other drivers worked have changed repeatedly during the course of this action without explanation. From the outset, Plaintiff's Amended Complaint offered no information about the basis of his allegation that other drivers worked between 50 and 100 hours per week.  *See* Am. Compl. ¶ 10-13.  To be sure, it contains no factual allegations indicating how Plaintiff came to the conclusion that he and other drivers worked such an exorbitant number of hours.  *Id.*  As of today, the means by which Plaintiff generated these allegations remains a mystery.

In contrast to the assertions in his Amended Complaint about 100-hour workweeks, *see* Am. Compl. ¶ 13, at deposition, Plaintiff testified that he has no reliable knowledge of the number of hours that he worked, much less any knowledge of other drivers' hours.  *See* Monk Dep. 160:21-24; 224:20-227:12.  Regarding his hours of work, Plaintiff testified:

> Q.  Did you work the same number of hours for the company each week during your employment with Elite? . . .
> ( )
> A.  No.
> Q.  So they varied?
> A.  Daily.
> Q.  They varied every day?
> A.  That is what daily means.
> Q.  And in addition to varying daily, the total number of hours you worked for the company in a week would vary from week-to-week; is that fair to say?
> ( )
> A.  Yes.
> Q.  And you've told me that you don't have any records of the hours that you worked.  So if I ask you the number of hours that you worked in a stated week, would you be able to respond to that? . . .

A.  When my attorney finishes their investigation of the records provided to us by the company, yes, we will be able to answer that question, but right now, no.

*Id.* 224:20-225:20.  As of the date of this opposition, Plaintiff has provided no records or analysis specifying his hours of work.

Regarding other drivers' hours of work, Plaintiff testified as follows:

Q.  Do you have any information at all about the number of hours per week that any other driver worked for Elite?
A.  *No, nor could I care less.*
Q.  That's of no consequence to you?
A.  Why would I care about what the next guy does?  It's not my business . . .[3]

*Id.* 226:20-227:3 (emphasis added).

To support this Motion, Plaintiff has again changed his position, providing a third account of his weekly hours of work.  Now, in direct contradiction of his Amended Complaint and deposition testimony, Plaintiff has submitted a declaration in which he claims to have "typically worked between 40 and 50 hours per week."[4]  *See* Monk Dec. ¶ 5, attached as Ex. 5. He provides no account as to how he was able to provide such a precise statement of his working hours after testifying to a lack of knowledge on this subject at deposition, nor does he explain the

---

[3] After a break and conference with his counsel, Mr. Monk purported to clarify this statement, but he did not change his testimony about the extent of his personal knowledge.  *See* Monk Dep. 227:7-12 ("I want to go back and say I will clean up something I said just before.  It's not that I didn't care about what the class was making.  When I was working with the company, it wasn't a concern of mine what another driver was making or what he wasn't making.").

[4] Plaintiff makes no specific representations in his declaration about other drivers' hours of work, but assumes without explanation that all drivers worked in excess of 40 hours per workweek. *See* Monk Dec. ¶ 14 (providing a hearsay account that he "spoke to other full time drivers in the course of [his] employment and they told [him] that none of them ever received any overtime premium pay for hours worked beyond 40 in one week").  Notably, Plaintiff has not identified any drivers who told him that they worked more than 40 hours in any workweek.  *See id.*

contrast between the 40-50 hours attested to in his declaration and the 50-100 hours alleged in his complaint.[5]  *See id.*

### D.  Drivers' Free Time Between Assignments

Underlying Plaintiff's erratic contentions regarding his and other drivers' hours of work are his allegations bearing on the compensability of time between driving assignments.  Plaintiff has made contradictory representations on this subject, as well.  Originally, Plaintiff claimed that he and all other drivers were "on call" between driving assignments and such time was compensable because they were not free during that time to do as they pleased.  *See* Am. Compl. ¶ 12.  Plaintiff testified to the opposite at his deposition, confirming that he and other drivers were free to do as they pleased between driving assignments, could pick and choose between assignments, and could even reject assignments.  Plaintiff testified:

> Q. So you did understand that you were free to decline jobs.
> A. Yes. . .
> Q. And did you in fact ever decline jobs?
> A. Unbelievable.  Yes.
> Q. What's unbelievable about that question?  I don't understand your frustration.
> A. Yes, I declined jobs.  I refused to do jobs. . .

Monk Dep. 185:8-19.

> Q.  Did they [Elite representatives] tell you specifically what to do between each trip or that decision was up to you?
> A.  *It's up to us.*
> Q.  Up to you Mr. Monk.
> A.  Sure.  I can do whatever I want as long as I'm where I'm supposed to be when it's time for me to be there.

*Id.* at 195:2-8 (emphasis added).

> Q.  Did the company provide you with instructions as to what you were not permitted to do between jobs? . . .
> (   )

---

[5]  Because of the contradictions between Plaintiff's deposition testimony and declaration, Defendants have moved to strike portions of Plaintiff's declaration.  *See* Dkt. 43.  That motion is pending as of the date of this opposition.

A. It's kind of obvious the things that you wouldn't do.

Q. Okay.  So if it's obvious, did the company not make any instructions to you on this subject?

A. No. . .

Q. So if you wanted to, could you sit in the car and read a book between jobs?

A. Yeah.

Q. Could you sit in the car and text with people between jobs?

A. Yeah.

Q. Could you sit in the car and surf the Internet on your phone between jobs?

A. Yeah.

*Id.* at 199:11-20.

This testimony is consistent with all of the record evidence.  For instance, Elite's managers and several drivers testified that Elite does not dictate what drivers do between driving assignments.  *See* Marra Dec. ¶ 10-14; Schiano Dep. 49:1-50:12, 72:24-73:19; Montross Dep. 139:2-15; Demetrius Tingurilis Dec. ¶ 8-9, attached as Exs. 6; Fiorvante Marra Dec. ¶ 7-8, attached as Ex. 7.   Elite has no written or unwritten policies that require drivers to do anything with even a remote benefit to Elite during that time.  *See* Montross Dep. 139:2-15; Marra Dec. ¶ 10-14; *see also* Elite's Responses to Plaintiff's Written Discovery, p. 9, attached as Ex. 8.  Drivers engage in an array of personal activities, such as running errands, shopping, sleeping, visiting friends or family, going to movies, attending religious services, or even going home.  *See* Demetrius Tingurilis Dec. ¶ 8-9; Fiorvante Marra Dec. ¶ 7-8; Marra Dec. ¶ 11-14; Schiano Dep. 49:1-50:12, 72:24-73:19.

The extent of the drivers' freedom between assignments is particularly obvious in situations where there are gaps of several hours between driving assignments.  *See* Demetrius Tingurilis Dec. ¶ 8-9; Fiorvante Marra Dec. ¶ 7-8; Marra Dec. ¶ 14.  This might occur, for example, when a driver drops off a customer for a flight at New York's JFK airport and there is a customer arriving at JFK several hours later who needs a ride back to Connecticut.  *See* Marra Dec. ¶ 14.  If the driver chooses to accept the return assignment, his only work-related

responsibility is to ensure that he picks up the second customer on time, leaving him a substantial span of time to use for his own purposes. *Id.*; *see also* Monk Dep. 195:2-8.

However, to support the present Motion, Plaintiff has yet again attempted to change his position on this point. Ignoring his prior testimony regarding every driver's freedom to do as he desires between driving assignments, Plaintiff now claims in his declaration that he and other drivers were not free during that time. *See* Monk Dec. ¶ 10-11. Specifically, Plaintiff declares:

> 10.   If I had time between jobs, I was not permitted to do whatever I wanted; I remained "on call."
>
> 11.   This was true for all other drivers, as well.

*See* Monk Dec. ¶¶ 10-11. This testimony is not in mere tension with Plaintiff's prior deposition testimony. It directly contradicts it. *Compare* Monk Dep. 185:8-19; 195:2-8; 199:11-20; 200:20-201:4 *with* Monk Dec. ¶¶ 10-11.

Plaintiff's contentions regarding the compensability of his time between assignments appear to be based in part on a claim that he was not free to use Elite's vehicles for his own purposes between engagements. This premise is both factually incorrect and legally misplaced. As a legal matter, Elite was not required to provide Plaintiff with transportation during his down time in order to render such waiting time non-compensable. *See* 29 C.F.R. § 785.16(b). As a factual matter, Plaintiff and other Elite drivers could and did use Company vehicles for their own purposes while waiting for their next assignment.[6] *See* Monk Dep. 195:2-8; 199:11-20; 200:20-201:4; Marra Dec. ¶ 10-14; Demetrius Tingurilis Dec. ¶ 8-9; Fiorvante Marra Dec. ¶ 7-8.

---

[6] In support of his claim that neither he nor any other driver could use Elite's vehicles for personal matters, Plaintiff relies solely on a policy document that he signed at the beginning of his employment indicating that Elite does not allow personal use of company vehicles. *See* Personal Use Policy, attached as Ex. 9. While Elite has a policy restricting personal use of company vehicles, Elite does not strictly enforce the policy, and drivers do not strictly abide by it. *See* Schiano Dep. 49:1-50:12; Marra Dec. ¶ 13-14; *See* Monk Dep. 195:2-8; 199:11-20; 200:20-201:4. Mr. Schiano and Mr. Marra, the individuals who supervise drivers, testified that

**E.     Any Viable Overtime Claims on Behalf of Elite's Drivers Were Extinguished by a Department of Labor Audit**

In about April 2014, the U.S. Department of Labor ("DOL") initiated a review of Elite's compliance with the FLSA.  *See* Marra Dec. ¶ 15.  In particular, the DOL investigated Elite's compliance with the FLSA's overtime provisions during the two-year period preceding April 2014.  *Id.*  As part of this process, DOL Investigator Sarah Thomas reviewed Elite's records and determined that most of Elite's drivers – including Mr. Monk – were owed nothing during the relevant period.[7]  *Id.*; *see also* Redacted Summary of Unpaid Wages, attached as Ex. 10.  However, the DOL contended that Elite owed a small number of drivers an aggregate total of $2,191.46 in overtime wages.  *Id.*  The DOL made no finding that Elite engaged in a willful violation of the FLSA, and therefore did not impose any penalties or liquidated damages.  *See id.*; *see also* Ex. A to Marra Dec. (Redacted Copies of Form WH-58).  The individual amounts that the DOL claimed Elite owed the 10 drivers ranged from $25.27 to $259.34, with one outlier ostensibly owed $1,184.89.  *See* Redacted Summary of Unpaid Wages.  Although Elite disagreed with the DOL's determination, rather than incurring the expense of disputing its liability for this modest sum, Elite chose to make the back wage payments.  *See* Redacted Copies of Form WH-58; Marra Dec. ¶ 17-18.

In connection with these back wage payments, the DOL provided Elite with a form each driver to sign, which the DOL refers to as "Form WH-58."  *See* Redacted Copies of Form WH-58; Marra Dec. ¶ 17.  The DOL provided written instructions stating that "[a]n employee paid in full under the Department of Labor's supervision waives any right to pursue private litigation to

---

Elite in fact allows all drivers to make use of its vehicles for personal matters.  *See* Schiano Dep. 49:1-50:12; Marra Dec. ¶ 13-14.  Plaintiff himself enjoyed this benefit.  *See* Marra Dec. ¶ 14; *See* Monk Dep. 195:2-8; 199:11-20; 200:20-201:4.

[7] Investigator Thomas conveyed to Elite that she was aware of the pendency of this litigation, and chose to proceed with her audit irrespective of the pendency of these proceedings.

recover such unpaid wages and liquidated damages for the time period indicated on the Form WH-58." *See* Instructions for Back Wage Payment, attached as Ex. 11.  More importantly, each Form WH-58 states:

> NOTICE TO EMPLOYEE: Your acceptance if this payment of wages and/or other compensation due under the Fair Labor Standards Act (FLSA) . . ., based on the findings of the [Wage and Hour Division] means that you have given up the right to bring suit on your own behalf for the payment of such unpaid minimum wages or unpaid overtime compensation for the period of time indicated above and an equal amount in liquidated damages, plus attorney's fees and court costs under Section 16(b) of the FLSA . . .

> I understand that my signature on this receipt and waiver attests to the fact that I have actually received the payment in the amount indicated above of the wages, liquidated damages, or other compensation due to me, and that I waive my right to bring suit as described above, and covering the period set forth above.

*See* Redacted Copies of Form WH-58; Marra Dec. ¶ 17.

Every driver who received a back wage payment from Elite signed this DOL form.  *Id.* In other words, the DOL has already investigated and adjudicated the claims that Plaintiff asserts in this action, finding that Elite owed a small amount in overtime compensation to a small number of drivers, but not Plaintiff.  Elite did not concede liability, but made the payments called for by the DOL's determination, and each individual who received a back wage payment signed a DOL-approved waiver of overtime claims in favor of Elite.  *Id.*

**F.     Many Elite Drivers Signed Arbitration Agreements that Preclude Them From Joining a Collective Action**

In addition to the waivers authorized by the DOL, many drivers entered private agreements with Elite in which they released the claims in this case.  *See* Ex. B to Marra Dec. (Redacted Exemplars of Arbitration Agreements). In March 2014, Elite updated arbitration agreements with drivers who had signed agreements at the beginning of their employment.  *See* Marra Dec. ¶ 19-20.  At the same time, Elite offered arbitration agreements to other drivers who

had not yet signed such agreements.[8]  *Id.*   Depending on each driver's circumstances, Elite

presented them with a document entitled "SUPPLEMENTAL ARBITRATION AGREEMENT

& GENERAL RELEASE," "ARBITRATION AGREEMENT & GENERAL RELEASE," or

"ARBITRATION AGREEMENT."  *See* Redacted Exemplars of Agreements (emphasis in

original); Marra Dec. ¶ 19-20.[9]

Employees who signed agreements bearing on their ability to pursue wage claims in

litigation were specifically apprised of this action and Plaintiff's claims.[10]  Before the release or

any other substantive provisions, the agreements identify this action by name (using prominent

italic print) and docket number.  *Id.* p. 1 ("on December 19, 2013, a lawsuit was filed against

Elite in the U.S. District Court for the District of Connecticut captioned *Jeffrey Monk, et al. v.*

*Elite Limousine Service, Inc., Ronald Montross, and Daniel Gardella*, docket number 13-cv-

01880-SRU (the 'Lawsuit')") (emphasis in original).  The agreements also highlight the specific

nature of Plaintiff's claims.  *Id.* ("asserting that Mr. Monk and other chauffeurs working for Elite

---

[8] As consideration, Elite paid $100.00 to drivers who chose to enter these agreements.  *See* Redacted Exemplars of Agreements.  The arbitration provision is bi-lateral, so like the drivers, Elite gave up the right to litigate employment-related legal disputes in court, in favor of arbitration's benefits.  *Id.* p. 1-2.  As further consideration, Elite released any known claims that it had against the drivers who elected to sign agreements containing releases.  *Id.* p. 3.

[9] Entering these agreements was not a mandatory condition of employment, and Elite informed each driver of this and his right to carefully review and consider the agreement before signing it.  *See also* Marra Dec. ¶ 19-20.  Each driver who signed an agreement acknowledged that he understood the agreement and signed it voluntarily, without coercion or duress, and intended to be bound by its terms.  *See* Redacted Exemplars of Agreements, p. 4-5.  In fact, one driver chose not to sign an agreement.  *See* Marra Dec. ¶ 19.

[10] Arbitration agreements entered with newly hired drivers do not contain releases and do not identify this action, as individuals who had done no prior work for Elite could have no claims to release or to pursue in this action as of their time of hire.  *See* Redacted Exemplars of Agreements.

-14-

have been improperly deprived of overtime wages"). In total, 36 drivers signed agreements, 33 of which contained releases. *See* Marra Dec. ¶ 20.

The arbitration provision in these agreements requires binding arbitration of "any legal claims that arise out of or relate to [the driver's] employment." *See* Redacted Exemplars of Agreements, p. 1-2. It also requires that claims be arbitrated on an individual, non-class basis, and requires the signing driver to refrain from joining collective actions, such as this one. *Id.* p. 2.

**G.     Elite's Drivers Have Shown an Affirmative Disinterest in this Action**

Plaintiff has submitted no evidence from any drivers to support either his underlying claims or his request for conditional certification. Indeed, Plaintiff testified that he has attempted to solicit other drivers to join his case, but the individuals he contacted showed no interest in this action and affirmatively rejected it. *See* Monk Dep. 101:1-110:20; 135:14-140:18.

This case has been pending since December 19, 2013. *See* Dkt. 1. Plaintiff has had nearly 1 year to garner support for his claims among putative class members. During that time, all drivers working for Elite have come to learn about this action or the claims in it through a number of channels, such as the express identification of this action in the arbitration agreements discussed above, interviews with the DOL, and informal discussions among themselves. *See* Marra Dec. ¶ 15. Despite these facts, no drivers have joined this action, and no drivers have provided Plaintiff with statements lending support to it.

Plaintiff's failure to gain putative class member support is not due to his or his attorneys' lack of effort. For example, Plaintiff's Counsel has publicized this action on his website, providing his contact information and details about how to join the lawsuit. *See* Printout from Website, www.hayberlawfirm.com (last visited September 18, 2014), attached as Ex. 12. Plaintiff's Counsel's website even includes misleading information regarding the level of interest

in this action, falsely suggesting that multiple drivers have sued Elite.  *Id.* p. 1  (stating, in the plural, that "***Drivers*** at Elite Limousine Service, Inc. are suing for unpaid overtime wages.") (emphasis added).  Notwithstanding this publicity, no drivers have joined this action and Plaintiff remains the only "driver" who has expressed any interest in it.

More importantly, Plaintiff has engaged in direct solicitation of drivers to join this lawsuit.  Plaintiff testified that he approached at least 4 other drivers--the ones whom he was "more friendly with than other drivers"--but "none of them were interested" in this lawsuit.  *See* Monk Dep. 101:1-110:20; 135:14-140:18.   In fact, Plaintiff stated that the putative class members with whom he discussed this action "wanted nothing to do with it."  *Id.*  One of those drivers, Michael Cahill, provided a declaration stating that Plaintiff informed him about this lawsuit and showed him Plaintiff's Counsel's website.  *See* M. Cahill Dec. ¶ 4, attached as Ex. 13.   Mr. Cahill told Plaintiff that he has "no interest in participating in the lawsuit" or pursuing claims against Defendants.  *Id.*  ¶ 4-7.  Mr. Cahill also said that he does not want Plaintiff or Plaintiff's Counsel to represent his interests or obtain his contact information.  *Id.*

Other drivers have provided comparable testimony reflecting their lack of interest in this action, rejecting the notion that Plaintiff and his counsel might represent them or obtain their contact information.  *See* R. Snider Dec., ¶ 3-6, attached as Ex. 14; I. Sirbu Dec., ¶ 3-6, attached as Ex. 15; Demetrius Tingurilis Dec. ¶ 10-12; Fiorvante Marra Dec. ¶ 9-10.

## PROCEDURAL BACKGROUND

August 1, 2014 was the original discovery deadline in this case, and the deadline for Plaintiff to move for conditional and/or class certification.  *See* Dkt. 18 and 23.  While Plaintiff twice moved to extend the discovery deadline, *see* Dkt. 34, 38, 48, 49, he has never sought an extension of the August 1, 2014 deadline to file motions for conditional or class certification.

On September 12, 2014, over a month after Plaintiff's deadline to move for conditional certification had expired, Plaintiff filed the present Motion without leave of Court. *See* Dkt. 39.

As of the time of this filing, the parties have nearly completed discovery related to Plaintiff's individual claims and request for conditional certification, including all written discovery and all depositions, except for one that is scheduled for November 26, 2014.

## ARGUMENT

### I.    PLAINTIFF'S MOTION IS UNTIMELY

As an initial matter, Plaintiff's Motion is late.  August 1, 2014 was Plaintiff's deadline to file the present Motion.  *See* Dkt. 18 and 23.  Plaintiff requested this deadline and the Court entered it as an order.  *See id*.  On August 4, 2014, after the deadline had passed, Plaintiff asked the Court to extend the discovery and dispositive motion deadlines, but he did not request an extension of the already expired deadline to file a motion for conditional certification.  *See* Dkt. 34 and 38.  On September 12, 2014, Plaintiff filed this Motion, approximately 6 weeks after his deadline to do so.  *See* Dkt. 39.  The Court should deny Plaintiff's Motion for that reason alone.  *Ouedraogo v. A-1 Int'l Courier Serv.*, 2014 U.S. Dist. LEXIS 132156, *21-23 (S.D.N.Y. Sept. 18, 2014) (denying motion for conditional certification as untimely).[11]

### II.    THE SLIDING SCALE STANDARD FOR FLSA CONDITIONAL CERTIFICATION

In addition to be untimely, Plaintiff's Motion fails on its merits.  Conditional certification of an FLSA collective action is inappropriate unless a plaintiff proves that he and members of the putative class are "similarly situated."  *Myers v. The Hertz Corp.*, 624 F.3d 537, 544-545, 555 (2d Cir. 2010) (establishing standard and affirming denial due to need for individualized inquires).  A plaintiff must show with sufficient admissible evidence that he and "potential opt-in

---

[11] An alphabetical index of all unpublished decisions cited in this opposition, along with copies of such decisions, is attached as Exhibit 16.

plaintiffs together were victims of [1] a common policy or plan that [2] violated the law."
Myers, 624 F.3d at 555.  "In other words, the court must be satisfied that there is a basis to
conclude that questions common to a potential group of plaintiffs would predominate a
determination of the merits."  *Mike v. Safeco Ins. Co.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003).
Conditional certification is not a presumptive right or a foregone conclusion that a court can
reach based on "unsupported assertions."  Myers, 624 F.3d at 555.  As common sense dictates,
identifying a shared job title or pay structure is not sufficient to warrant an exception to the
longstanding principle that claims should be adjudicated on an individual basis.  *Colson v. Avnet*,
687 F. Supp. 2d 914, 927 (D. Ariz. 2010) ("mere classification of a group of employees . . . is not
by itself sufficient . . . evidence of a common policy, plan, or practice that renders all putative
class members as 'similarly situated'"); *Anglada v. Linins 'N Things, Inc.*, 2007 U.S. Dist.
LEXIS 39105, *16 (S.D.N.Y. April 26, 2007) adopted by 2007 U.S. Dist. LEXIS 38918
(common job title or classification does not evidence a common policy).  "It would be a waste of
. . . time and resources to notify a large and diverse class only to later determine that the matter
should not proceed as a collective action because the class members are not similarly situated."
*Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

Where the parties have engaged in discovery prior to Plaintiff's motion for conditional
certification, the plaintiff has a higher burden of showing that other putative class members are
similarly situated.  *See Alicea v. Walsh Const. Co.*, No. 13-cv-00102-MPS, slip op. at *10-12 (D.
Conn. Sept. 30, 2014) (applying heightened standard after "substantial discovery"); *Botero v.
Commonwealth Limousine Serv., Inc.* 2014 U.S. Dist. LEXIS 40636, *8 (D. Mass. March 25,
2014) ("standard is 'lenient' when based solely on the pleadings but increases as more evidence
is presented to the Court."); *Hendricks v. J.P. Morgan Chase Bank*, 263 F.R.D. 78, 83 (D. Conn.

2009) (court "should determine whether to certify [a] collective action based on the full evidence before it, rather than merely examining the pleadings and affidavits"). The standard rests on a sliding scale, meaning the plaintiff's burden increases with the amount of discovery that occurs before the court addresses conditional certification. *Bunyan v. Spectrum Brands, Inc.*, 2008 U.S. Dist. LEXIS 59278, *6-14 (S.D. Ill. July 31, 2008) (applying more stringent standard where substantial discovery had occurred); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 U.S. Dist. LEXIS 105302, *11-16 (W.D. N.C. Sept. 16, 2011) (applying intermediate standard where some discovery had occurred); *Howard v. Securitas Sec. Servs. USA Inc.*, 2009 U.S. Dist. LEXIS 3913, *17 (N.D. Ill.  Jan. 20, 2009) (plaintiff must provide "allegations and declarations that successfully engage those of the defendants to the contrary"). Here, discovery is not merely underway; it is almost finished. The Court should therefore view Plaintiff's motion with greater scrutiny and evaluate whether the record as compiled gives reason to believe that there are claims presented here that are likely to be resolved efficiently or on a collective basis.

Courts also decline to conditionally certify collective action claims where the record reflects a lack of interest among would-be class members. *See O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) ("[c]ourts have considered such interest to be a requirement to justify conditional certification") (citations omitted); *Kubiak v. S.W. Cowboy, Inc.*, 2014 Us. Dist. LEXIS 80225, *34-51 (M.D. Fla. June 12, 2014) (holding plaintiffs must show interest, and denying certification where only 8 individuals joined over 18 months); *Hendricks*, 263 F.R.D. at 87 (denying certification in part on fairness grounds where no individuals had joined). Conditionally certifying an action that lacks support among putative class members would squander the Court's and parties' resources. Moreover, denial of conditional certification where plaintiffs fail to show class member interest serves to prevent

plaintiffs and their counsel from soliciting disinterested participants or would-be clients.  *See*

*Armstrong v. Weichert Realtors*, 2006 U.S. Dist. LEXIS 31351, *5-6 (D.N.J. May 19, 2006)

(denying conditional certification and noting concerns of abuse and "fishing expeditions" where

conditional certification is granted absent an adequate showing) (citing *Hoffmann-La Roche,*

*Inc. v. Sperling,* 493 U.S. 165, 171 (1989)).

### III.   PLAINTIFF HAS FAILED TO ESTABLISH THAT HE AND PUTATIVE COLLECTIVE ACTION MEMBERS ARE SIMILARLY SITUATED

#### A.   Plaintiff Has Made No Factual Showing Of A Common Scheme That Violated The Law

Under the FLSA, non-exempt employees must receive overtime compensation at 1.5

times their regular rate of pay for all hours of work in excess of 40 hours per workweek.  *See* 29

U.S.C. § 207(a)(1); *see also* 29 C.F.R. § 785.1.  The Parties agree on this basic rule.  In this case,

the key phrase is "hours of work," which is not always a straightforward inquiry.  *See* 29 C.F.R.

§ 785.6.  In fact, questions of whether "on call" or "waiting time" is compensable "work" have

generated a significant body of law.  *Id.* at § 785.11-17.  As a basic proposition, an employee

performs compensable "work" under the FLSA when he is at the behest of his employer and

"unable to use the time effectively for his own purposes."   *Id.* at § 785.15; conversely, an

employee who is relieved of duties and relatively unrestricted to use the time for "personal

purposes" is not performing "work," and thus not entitled to receive compensation or credit for

that time in calculating hours of work.  *Id.* at § 785.16.

The crux of Plaintiff's overtime claim is that Elite required all drivers to "wait and be on

call" between driving assignments but did not credit that time as hours of work, resulting in

workweeks exceeding 40 hours with no overtime compensation.  *See* Am. Compl. ¶ 11-13.  This

is the alleged common policy that Plaintiff claims violated the law.  *See id.*  However, Plaintiff

has made no evidentiary showing to support his conclusory allegation of compensable "waiting

time" work.  *Blaney*, 2011 U.S. Dist. LEXIS 105302 at *23 (denying conditional certification

where plaintiff lacked "evidence of a common policy which required [putative class members] to

be 'on call' during their meal breaks").  Under the more lenient standard that applies to cases

involving little or no discovery, Plaintiff would be required to make a "modest factual showing"

that Elite required drivers to be "on call" between driving assignments, but failed to credit that

time as hours of work.  *See Fernandez v. On Time Ready Mix, Inc.*, 2014 U.S. Dist. LEXIS

141945, *3-5 (E.D.N.Y. Oct. 4, 2014).  Plaintiff has failed to meet this standard, much less the

more rigorous standard that applies in cases like this, where discovery is virtually finished.

*Botero*, 2014 U.S. Dist. LEXIS 40636 at *9-14.  Here, the full record evidence confirms that if

drivers are "similarly situated" in any way, it is only in their disinterest in this litigation.

To start, Plaintiff's testimony reflects that he has no idea about the number of hours that

he or any other driver worked.  *See* Monk Dep. 224:20-227:12.  He has no records of his own

hours, and he "could not care less" about the hours that other drivers worked.  *Id.*  Much more

importantly, Plaintiff testified that he and other drivers were in fact free to do as they pleased

between driving assignments, and did so.  *Id.* at 195:2-8  ("it's up to us . . ."); *see also id.* at

185:8-19, 199:11-20.  Plaintiff's own testimony establishes that he and other drivers did not

perform compensable work between driving assignments.  Indeed, he admitted that Elite did not

require him or other drivers to "wait" or be "on call" during those times.

While Plaintiff has submitted a declaration in which he attempts to contradict his prior

sworn testimony and claim that he was not free between assignments, *see* Monk Dec. ¶ 10-11,

that testimony has little or no evidentiary value.  *See Newport Elec., Inc. v. Newport Corp.*, 157

F. Supp. 2d 202, 219-220 (D. Conn. 2001) (striking portions of affidavit that contradicted prior

deposition testimony).  The Court should either strike the contradictory portions of Plaintiff's declaration, *see* Dkt. 43, or disregard them when evaluating his Motion.

Amplifying Plaintiff's feeble evidentiary showing is the fact that he has presented no evidence regarding the number of hours that any other drivers worked--not a single affidavit, declaration, or even an unsworn statement.  *See Fernandez*, 2014 U.S. Dist. LEXIS 141945, *3-5 (a plaintiff must identify other employees and explain how they were similarly situated, and a failure to do so is "fatal"); *Armstrong*, 2006 U.S. Dist. LEXIS 31351, *5-6 (denying conditional certification where plaintiff did not show that anyone else worked overtime).  Likewise, Plaintiff cannot testify based on his personal knowledge because he admitted to lacking knowledge regarding other drivers' working conditions.  *Compare Francesse v. People's United Bank*, 2013 WL 3049333, *2-3 (D. Conn. June 17, 2013) (crediting plaintiff's affidavit about other employees' work time because he was in a position to observe their work, had personal knowledge of their work time, and did not contradict his own testimony).  Plaintiff's failure to produce any objective support for his claim of compensable waiting time distinguishes this case from the cases on which he relies in his Motion.

Simply put, Plaintiff wants the Court to certify a collective action consisting of drivers who worked more than 40 hours per week without overtime compensation, but he has provided no evidence that any drivers worked more than 40 hours per week.  He had an obligation to make an adequate factual showing of a policy that violated the law, but the most he could muster was his own self-serving and contradictory declaration that contains no specific information about other drivers.  *See Hendricks*, 263 F.R.D. at 83-87 (denying conditional certification where plaintiff submitted no declarations from putative class members); *Fernandez*, 2014 U.S. Dist. LEXIS 141945 at *4-5 (noting lack of specific information about other drivers "underscores that

plaintiff has not established a factual nexus between his situation and that of the other drivers, none of whom may actually have been victims of defendant's allegedly illegal policies"); *Dreyer v. Altchem Envtl. Servs.*, 2006 U.S. Dist. LEXIS 93846, *5-7 (D.N.J. Dec. 12, 2006) (denying conditional certification where plaintiff failed to submit affidavits showing others subject to unlawful policy).   Plaintiff did not even provide specific information about his own hours of work.   Plaintiff's failure to make any evidentiary showing, even with the benefit of substantial discovery, is fatal to his bid for conditional certification.

At best, Plaintiff has established that he and other drivers shared a job description that reflects commonsense duties for any driver, such as dressing appropriately, displaying courtesy, and being on time.   *See* Dkt. 40-3.   None of those points of commonality have any bearing on the issues to be adjudicated in this action.   The job description that Plaintiff invokes does not state that drivers must wait in particular places between driving assignments or perform any particular tasks between driving assignments.   *Id.*   Nor does it provide any grounds for an inference that drivers work more than 40 hours per week.   *Id.*   This job description therefore does not reflect a common policy that violates the law.   *See Colson*, 687 F. Supp. 2d at 927; *Anglada*, 2007 U.S. Dist. LEXIS 39105 at *16.   Common sense dictates that a job description with no mention of duties between assignments cannot substantiate a collective action claim based on uncompensated waiting time.   If anything, reliance on the plain language in the job description leads to the opposite conclusion.   If the job description does not require drivers to do anything in particular between assignments, then the most logical inference is that drivers may use time between assignments as they see fit.   Plaintiff's reliance on the drivers' shared job description is misplaced.

In contrast to Plaintiff's unsupported position regarding "waiting" time, Defendants have presented uniform testimony that all drivers were free to do as they pleased between assignments.  *See* Marra Dec. ¶ 10-14; Schiano Dep. 49:1-50:12, 72:24-73:19; Montross Dep. 139:2-15; Demetrius Tingurilis Dec. ¶ 8-9; Fiorvante Marra Dec. ¶ 7-8.  They went home, visited friends and family, went to the movies, and ran errands, to name a few activities that drivers engaged in between assignments.  *See id.*  The decision was up to each driver.  This evidence regarding driver freedom between assignments comes not only from testimony that management has provided--it comes from the drivers themselves.  *See* Demetrius Tingurilis Dec. ¶ 8-9; Fiorvante Marra Dec. ¶ 7-8.  Drivers maintain that they did not have to "wait" between assignments and engaged in a variety of personal activities during that time.  *Id.*  They even confirm that Defendants enabled their freedom from work between assignments by allowing them to use company vehicles to engage in personal activities.  *Id.*  Aside from his self-serving, conclusory, and contradictory declaration, Plaintiff has presented no contrary evidence.  In the absence of compelling support for his claim that drivers are similarly situated with respect to those factors that would determine their entitlements to overtime, the Court should deny Plaintiff's Motion.

**B.      Individualized Inquiries Are Necessary and Underscore the Lack of Similarity Among Drivers**

In many cases, including cases on which Plaintiff relies in his Motion, the number of hours that each employee "worked" is either not in dispute or easy to ascertain.  That is not true here given Plaintiff's waiting time claims.  "Whether waiting time is time worked under the [FLSA] depends on the particular circumstances."  *See* 29 C.F.R. § 785.14.  "The determination involves scrutiny of the agreements between the parties, . . . and all of the circumstances.  Facts may show that the employee was engaged to wait or they may show that he waited to be

engaged." *Id.* "Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." *Id.* at § 785.16(a). To illustrate the fact-intensive nature of the "waiting time" inquiry, the DOL's Regulations include a hypothetical that is informative here:

> A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period. If the driver reaches his destination and while awaiting the return trip is required to take care of his employer's property, he is also working while waiting. In both cases the employee is engaged to wait. Waiting is an integral part of the job. On the other hand, for example, if the truck driver is sent from Washington, DC to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time. He is waiting to be engaged.

*Id.* at § 785.16(b) (internal citations omitted).

Concluding whether time between assignments was or was not compensable "waiting time" is the only way to determine the number of hours that any driver worked in any given workweek. By extension, it is the only way to determine whether any driver is entitled to overtime compensation, and if so, the extent of that entitlement. This threshold determination regarding compensable work time is therefore fundamental to the ultimate liability and damages questions in this case.

Based on the record before the Court, it is clear that this threshold inquiry is an undertaking that would require time-consuming individualized examinations into each driver's activities between assignments. The parties will have to conduct, and the Court will have to preside over, a painstaking examination of each driver's circumstances to determine if his time between assignments was compensable work time. This examination would include an analysis of voluminous records regarding each drivers assignments on a day-by-day basis.

In analogous circumstances, courts deny conditional certification. *See Dean v. Priceline.com, Inc.*, 2001 U.S. Dist. LEXIS 24982, *7 (D. Conn. 2001) ("from a practical

standpoint, litigating this case as a collective action would be extremely difficult, at best" and noting need for "a careful factual analysis of the full range of the employee's job duties and responsibilities.") (quoting *Cook v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 59-61 (D. Conn. 1997)); *Mike*, 274 F. Supp. 2d at 220-221 ("Because the proof in this case is specific to the individual, [plaintiff] has not provided evidence of a common thread binding his proposed class"); *Syrja v. Westat, Inc.*, 756 F. Supp. 682, 687-689 (D. Md. 2010) (denying conditional certification due to need for individualized inquiries to determine hours of work and thus liability and damages); *Botero*, 2014 U.S. Dist. LEXIS 40636 at *9-14 (denying conditional certification where inquiry into compensable work time is "highly individualized").  Much like these cases, the liability and damages questions in this case are not simple questions that can be answered with a broad stroke as to all drivers.  Indeed, Plaintiff has not and cannot propose a means by which every driver's compensable work time and corresponding entitlement to overtime can be determined on generalized proof.  At bottom, conditional certification makes little sense when ultimately the only means of adjudication is to conduct a series of mini-trials.

## IV.  MANY PUTATIVE CLASS MEMBERS HAVE WAIVED THE CLAIMS IN THIS ACTION AND/OR AGREED TO ARBITRATE ANY EMPLOYMENT DISPUTES

The various agreements that putative class members have signed bring the absence of similarity among drivers and the impracticality of collective adjudication even more into focus. *See Alicea*, No. 13-cv-00102-MPS, at *16-17 (collective action improper due to individualized defenses); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 2014 U.S. Dist. LEXIS 77669, *5 (E.D.N.Y. June 5, 2014) (same).  This further compels denial of Plaintiff's Motion.

As detailed above, a number of putative class members have signed one or more documents that either prohibit or substantially limit their ability to participate in this action.  The DOL examined each driver's entitlement to overtime compensation between April of 2012 and

April of 2014. *See* Marra Dec. ¶ 15-18. This period covers a substantial portion of the statutory period at issue in this case. The DOL concluded that only 10 drivers (not including Plaintiff) should receive small back wage payments, typically in the range of $25 to $250. *See* Marra Dec. ¶ 16-17 (Redacted Copies of Form WH-58). The drivers whom the DOL asserted to be owed overtime executed DOL-sanction waivers of all overtime claims. *See* Redacted Copies of Form WH-58; *see also Ribot v. Farmers Ins. Co.*, 2013 U.S. Dist. LEXIS 136868, *3 (C.D. Cal. Sept. 24, 2013) ("courts that have considered the issue have consistently and persuasively held that acceptance of settlement funds and receipt of the applicable notice form (WH 58) is sufficient to constitute waiver of FLSA claims"). Similarly, 36 drivers have entered private agreements with Elite. *See* Marra Dec. ¶ 20 ( Redacted Exemplars of Agreements). In all of those agreements, drivers agreed to arbitrate employment disputes, including wage and hour claims. In 33 of those agreements, drivers also released wage claims, specifically including the claims in this action. It would be a waste of time to invite any of these individuals, who make up a substantial portion of Plaintiff's proposed collective, to join this litigation.

If plaintiff were to contend that any of these agreements are unenforceable, that claim would only multiply the obstacles to collective treatment. As to any particular driver, the binding nature of their agreements will depend on the particular circumstances under which the parties entered them. This, of course, will require individualized and time-consuming inquiries into the facts surrounding each drivers execution of these documents. For drivers who signed both DOL waivers and private agreements, the individualized inquiries will be even more labor-intensive. On top of the individualized inquiries bearing on the extent of each driver's compensable work time, issues bearing on the ability and/or extent to which certain drivers may

participate in this action would consume this litigation and overwhelm any issues that are common to all drivers.

### V.   PUTATIVE CLASS MEMBERS HAVE NO INTEREST IN THIS ACTION

Regardless of their legal ability to do so, members of the proposed collective do not want to participate in this action.  Plaintiff has ignored this fact and made no showing of putative class member interest despite his obligation to do so.  *See O'Donnell*, 429 F. Supp. 2d at 250-251 (noting requirement to show interest and holding plaintiffs' personal beliefs not enough); *see also Kubiak,* 2014 U.S. Dist. LEXIS at *34-48; *Hendricks*, 263 F.R.D. at 87.  Given the optional and voluntary nature of overtime claims under the FLSA, extending invitations to this disinterested group would be a distraction and a waste of resources.

This action has been pending since December 2013.  Plaintiff has had roughly 1 year to find support for his claims among the drivers he seeks to represent.  During that time, nearly all of the relevant drivers have learned about this action and Plaintiff's underlying claims.  Drivers learned about the overtime issues in this case as a result of the DOL's investigation.  Plaintiff has engaged in direct solicitation of drivers to participate in this action.  *See* Monk Dep. 101:1-110:20, 135:14-140:18.  Plaintiffs' Counsel has solicited drivers to participate in this action through his website.  *See* Ex. 12.  Further, most of the drivers at issue were apprised of the pendency of this case by Elite in arbitration agreements that specifically disclosed the name and nature of this case.  *See* Ex. B to Marra Dec.  Nevertheless, Plaintiff has found no support for his claims.

Juxtaposing Plaintiff's total failure to garner support for his claims or bid for conditional certification, Defendants have submitted a number of declarations from putative class members reflecting that those individuals (1) disagree with Plaintiff's claims, (2) have no interest in participating in this action, and (3) do not approve of Plaintiff or Plaintiff's Counsel representing

them in any capacity. *See* Exs. 6-7, 13-15. Among the drivers who provided these declarations is Mr. Cahill, one of the individuals whom Plaintiff was most friendly. *See* Ex. 13.

On this record, Plaintiff has failed to show that any other drivers wish to join this action. All of the facts belie any argument that drivers are interested in joining this suit or that further notice and opportunity to join this lawsuit is warranted.

## VI.   THE COURT SHOULD REJECT PLAINTIFF'S NOTICE-RELATED PROPOSALS

If the Court were to grant Plaintiff's Motion, there are fundamental problems with Plaintiff's requests to (1) toll the statute of limitations, (2) apply a 3-year limitations period for purposes of issuing notice to potential collective action members, and (3) issue notice in the form identified in his Motion papers. As detailed below, the Court should reject Plaintiff's proposals.

### A.   Plaintiff Has Not Shown Extraordinary Circumstances That Warrant Tolling

An opt-in plaintiff's FLSA claims do not relate back to the filing of the original complaint for statute of limitations purposes. *See Alicea*, No. 13-cv-00102-MPS, *20 (quotations omitted). The general rule, as Plaintiff concedes, is that each opt-in plaintiff's FLSA claim is limited to no more than the 3-year period preceding his filing of an opt-in form. *See* Motion, p. 14. While equitably tolling the statute of limitations is not prohibited, the Second Circuit has held that it "is only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass v. N.Y. City Trans. Auth.*, 333 F.3d 74, 80 (2d Cir. 2003). A plaintiff seeking equitable tolling must therefore establish that she "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* at 80-81. Tolling is a rare measure that is generally reserved for situations where the plaintiff seeking tolling filed a timely but defective pleading, medical

impairments prevented a timely filing, or a defendant's misconduct prevented a timely filing. *Id*

at 80. Here, Plaintiff asks the Court to toll the statute of limitations so that each theoretical opt-

in plaintiff's FLSA claim is measured not from the date that he files an opt-in form, but rather

from the date of this Motion (September 12, 2014). *See* Motion, p. 16. Plaintiff has failed to

make any showing of "extraordinary" circumstances that would justify such a request.

Plaintiff points to his alleged diligence in filing his Motion as the only support for tolling.

*See* Motion, p. 15. As a threshold matter, Plaintiff's diligence in that regard is very much in

question. Plaintiff initiated this action on December 19, 2013. *See* Dkt. 1. He waited

approximately 9 months, until September 12, 2014, to file his Motion. *See* Dkt. 39. As noted

above, September 12, 2014 is more than 1 month after the deadline that Plaintiff requested (and

the Court ordered) for the filing of any motion for conditional certification. *See* Dkt. 18 and 23.

This sequence of events does not reflect diligence. More importantly, the diligence inquiry

should focus on the potential opt-in plaintiffs--not Plaintiff.

Even if Plaintiff had been diligent, he has overlooked the second part of his burden to

justify tolling, namely that "the circumstances are so extraordinary" that tolling is proper.

Plaintiff has identified no circumstances applicable to him or any potential opt-in plaintiff that

suggest tolling is appropriate. He does not allege that potential opt-in plaintiffs have tried to join

this case, nor does he allege that Defendants have tried to hide the existence of this case from

potential opt-in plaintiffs. In fact, the record establishes that the opposite is true. *See* Section V,

supra. Putative class members have been aware of this action for months, but none of them have

joined or attempted to join this action. *Id*.

Plaintiff seems to presume that the mere passage of time between the filing of his Motion

and the Court's adjudication of it constitutes "extraordinary circumstances." Plaintiff's

assumptions misconstrue the Second Circuit's meaning of "extraordinary circumstances."  *See Zerilli-Edelglass*, 333 F.3d at 80-81.  Indeed, courts deny similar requests for tolling where plaintiffs fail to make the required showing, even in cases that present more compelling circumstances than Plaintiff has identified.  *See Alicea*, No.13-cv-00102-MPS, at *22 (denying tolling where nearly 1 year passed between filing of motion and court ruling, and defendant had no role in delays); *Zhang v. Tommy's Sushi, Inc.*, 2014 U.S. Dist. LEXIS 147981, *14-15 (S.D.N.Y. Oct. 16, 2014) (denying tolling where plaintiff identified no "unusual or extraordinary circumstances" and holding that court would address timeliness of any class member's claims at later date; *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2001) (denying tolling as premature, noting it was "not yet clear whether or not any potential plaintiffs will be barred from this action due to a delay in notice"); *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 479-480 (S.D.N.Y. 2008) (denying tolling absent showing of misconduct by defendants and diligence by any putative class members).

The cases on which Plaintiff relies emphasize his failure to establish exceptional circumstances that may warrant tolling.  *See* Motion, p. 15-16 (citing *Yahres v. Rest. Assoc. Events Corp.*, 2011 U.S. Dist. LEXIS 23115, *8-9 (E.D.N.Y. March 8, 2011) ("defendant's actions . . . frustrated plaintiffs' diligent attempts to ensure that claims did not expire."); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 196, 200 (S.D.N.Y. 2006) (court directed plaintiff not to file motion for conditional certification until after decision on summary judgment); *Abadeer v. Tyson Foods, Inc.*, 2010 WL 5158873, *1 (M.D. Tenn. Dec. 14, 2010) (plaintiff filed motion early and court delayed ruling to allow defendant to first conduct discovery); *Ware v. T-Mobile USA*, 2012 U.S. Dist. LEXIS 143439, *22-27 (M.D. Tenn. Aug. 28, 2012) (defendant was not "forthcoming" and caused delay); *McGlone v. Contract Callers, Inc*., 867 F. Supp. 2d 438, 445

(S.D.N.Y. 2012) (noting "heavy dockets and understandable delays in rulings" as reason for tolling)).  Contrary to Plaintiff's suggestion, these cases do not hold that tolling is appropriate based simply on the normal passage of time between a motion for conditional certification and a court's ruling on such a motion.

### B.   Plaintiff Has Shown No Basis to Apply a 3-Year Limitations Period for Purposes of Notifying Putative Collective Action Members

A plaintiff must file an action under the FLSA within 2 years after the cause of action accrues, except that a 3-year limitations period applies to "willful" violation.  *See* 29 U.S.C. § 255(a).  To take advantage of the extended statute of limitation period, the plaintiff bears the burden of proof on the issue of willfulness.  *See Herman v. RSR Sec. Servs. LTD*, 172 F.3d 132, 141 (2d Cir. 1991).  To establish willfulness, a plaintiff must prove that the defendant "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Because the plaintiff bears the burden of proof on the issue of willfulness, the Court should not use a 3-year limitations period when authorizing notice unless the plaintiff makes an adequate evidentiary showing of willfulness or reckless indifference.  Here, Plaintiff has made no such evidentiary showing whatsoever.  In fact, Plaintiff has not even made allegations suggesting that Defendants violated the FLSA willfully or with reckless indifference to drivers' rights.

As of the date of this Motion, Plaintiff has provided no evidentiary support for his overtime claim, much less any contention that any violation was willful or reckless.  Plaintiff admits that he never complained internally about any unfair wage practices during his employment; he does not claim that anyone else put Defendants on notice of any alleged unlawful wage practices during his employment; and he does not claim that Defendants have ever been subject to prior litigation that would have put them on notice of any alleged unlawful

pay practices.   In other words, even if Plaintiff could establish that Defendants violated the FLSA, he has presented no evidence that the violation was anything more than a good faith dispute regarding the law's requirements or an honest mistake.

The DOL confirmed the lack of any willful or reckless violation of the FLSA when it conducted an investigation earlier in 2014.   At that time, the DOL determined that Elite had not acted willfully or recklessly and did not seek to impose liquidated damages on Elite.   *See* Marra Dec. ¶ 15-18; Redacted Copies of Form WH-58.

Under these circumstances, the Court should not allow Plaintiff to invoke the FLSA's extended statute of limitations and invite individuals to join this action who are in a position only to assert untimely claims.   If the Court conditionally certifies a collective action and authorizes notice to potential collective action members, the notice should only cover a 2-year period, measured from the Court's conditional certification order.

## C.   Plaintiff's Proposed Notice Lacks Important Information

Defendants object to Plaintiff's proposed form of notice to potential collective action members on a number of grounds.   *See* Dkt. 40-16.   First, Plaintiff's proposed notice lacks a thorough statement regarding an opt-in plaintiff's obligations upon joining this action.   The notice should have a separate heading that reads: "**My Obligations If I Join This Suit**."   In a similar vein, the notice should state that each opt-in plaintiff may be obligated to pay Defendants' litigation expenses if Defendants prevail.   *See Espinoza v. Galardi South Enters.*, 2014 U.S. Dist. LEXIS 150775, *33 (S.D. Fla. Oct. 23, 2014) ("notice must notify class members that if there is no judgment in their favor, then Defendants may request the Court to order reimbursement of their litigation expenses against them.").

Second, the Notice should reflect Defendants' position that Plaintiff is not an appropriate representative of any group of drivers due to defenses that are unique to him, including Defendants' argument that Plaintiff was a part-time employee who never worked more than 40 hours during any week applicable to this action.

Third, the notice should reflect that it is being sent only to drivers who have been employed by Elite during the 2-year period preceding the Court's order conditionally certifying a collective action--not September 12, 2011, as reflected in Plaintiff's proposed notice.   This shorter period is appropriate because, as argued above in Section VI(A-B), opt-in plaintiffs' claims do not relate back to the filing of Plaintiffs Complaint and Plaintiff has established no basis to apply the longer 3-year limitations period applicable to willful FLSA violations.[12]

## CONCLUSION

For the above reasons, the Court should deny Plaintiff's Motion to Proceed as a Collective Action and to Authorize Notice to Individuals in the Putative Collective Action (Dkt. No. 39).

---

[12] Also, the notice incorrectly states Defendants' Counsels' contact information.  The notice should reflect that "Barry J. Miller" and "Anthony S. Califano" represent Defendants in this action, and their address is "2 Seaport Lane, Suite 300."  It is not "One International Place."

Respectfully submitted,

DEFENDANTS, ELITE LIMOUSINE
SERVICES, INC., RONALD MONTROSS,
DANIEL GARDELLA, AND STEVEN
SCHIANO,

By their attorneys,

 /s/ *Anthony S. Califano*
Barry J. Miller (admitted *pro hac vice*)
Anthony S. Califano (ct fed. bar # 27323)
SEYFARTH SHAW LLP
World Trade Center East
Dated: November 21, 2014                    Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Telephone:  (617) 946-4800
Fax:  (617) 946-4801
bmiller@seyfarth.com
acalifano@seyfarth.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2014, a copy of the foregoing was filed
electronically through the Court's ECF system.  Notice of this filing will be sent by e-mail to all
parties by operation of the Court's electronic filing system or by mail to anyone unable to accept
electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing
through the Court's CM/ECF system.

 /s/ *Anthony S. Califano*
Anthony S. Califano

18417437v.10